UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America   :
                           :
                           :
          v.               :          Case No. 2:05-CR-25
                           :
Cassius Lamar Shine        :
                           :


MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Paper 111 & 112)

Defendant Cassius Shine moves to dismiss the indictment
based on the government's destruction of material physical
evidence. (Paper 111).  Shine also moves for the production
of the crack cocaine for independent testing or, in the
alternative, to exclude the trial testimony of government
chemists.  (Paper 112).  On April 9, 2007, Chief Judge
Sessions referred these motions for a report and
recommendation.  An evidentiary hearing was held on May 22,
2007.  Shine then submitted a post-hearing memorandum to
which the government has responded.  For the reasons set
forth below, I recommend that the Court **DENY** Shine's motion
to dismiss and **DENY** his motion to produce or exclude.

Factual Findings

After conducting surveillance and a controlled purchase

of cocaine base ("crack" or "crack cocaine") from occupants
of an apartment located at 140 Grove Street in Rutland,
Vermont, Detective David LaChance of the Rutland Police
Department obtained a warrant to search the apartment.  On
October 29, 2004, officers executed the search warrant and
found Shine and James Rutherford present in the apartment,
which was Rutherford's residence. Officers conducted a "pat
frisk" on Shine and found a small bag containing gold
jewelry and a large amount of cash.  Officers also
discovered approximately seven grams of marijuana in Shine's
shoe and two baggies of crack cocaine in a cigarette
package.  The officers then searched the rest of the
apartment while Shine and Rutherford were kept handcuffed in
the living room.

In the kitchen, officers found sandwich baggies,
rolling papers, a highlighter, a knife, a mirror, and
scales.  In the oven, they found a pan with a moist
substance that officers suspected was cocaine in the process
of becoming crack.  Loose powder found on top of the stove
under a burner was field tested and was positive for
cocaine.  A doorway from the kitchen to stairs leading down
to the basement provided the only access to the basement

from inside the building.  A door leading out of the
basement was locked from the inside and not accessible from
the outside.

Officers searched the basement and found a pile of
clothing and a pair of sweat pants rolled up on the pile.
Inside the sweat pants officers found a McDonald's bag
containing 59 separately wrapped pieces of crack cocaine.
Also in the bag were four baggies containing cocaine, pills,
and an empty baggie.  Papers in Rutherford's name were also
found in the basement.  Throughout the apartment, officers
found several cell phones, pills, paraphernalia, and
packaging materials.

On February 16, 2005, Shine and Rutherford were
indicted for conspiracy to manufacture and possess with the
intent to distribute 50 grams or more of crack cocaine and
possession with the intent to distribute crack cocaine.  On
April 17, 2006, Rutherford plead guilty to the conspiracy
count (Count 1) and, pursuant to a plea agreement, agreed to
cooperate with the investigation in exchange for the
government dismissing the remaining counts in the
indictment. (Paper 42).  On January 10, 2007 the grand jury
returned a two-count superseding indictment charging Shine

3

with a conspiracy to distribute cocaine base and the distribution of cocaine base. (Paper 97). Rutherford is expected to testify at Shine's trial and has provided the government with written and oral statements about Shine. Rutherford indicated that he had begun selling crack cocaine for Shine, whom he knew as "Goldie," for about a week before his apartment was searched. According to Rutherford, he sold crack cocaine to about ten customers per day and his compensation was crack cocaine. On October 28, 2004, the night before the search, Goldie came to Rutherford's apartment and began cooking more cocaine into crack cocaine in the kitchen. Rutherford then helped Goldie package the crack cocaine into $100 baggies.

The evidence obtained in the search was initially secured in the Rutland Police Department's evidence storage facility. The drugs seized were later submitted to the Vermont Forensic Laboratory (VFL). On January 6, 2006, the VFL issued a report with the following findings:

1. One of the two baggies seized from the cigarette package was examined and found to contain .57 grams of cocaine base. The material was solid and had a light tan color.

4

2. Three baggies seized from the basement were examined and found to contain 3.29, 3.34, and 4.83 grams of cocaine. The material was either solid or powder of an off-white color.

3. Fifty-nine baggies seized from the basement contained light tan colored solid material.  Eleven baggies contained cocaine base in amounts ranging from .36 to .78 grams.

4. One baggie contained eight pills physically consistent with Oxycodone.
(Ex. 1).

VFL issued a second report on August 30, 2006, finding the moist substance seized from a pot in the kitchen consisted of 19.24 grams of white power that contained cocaine.  Due to the low concentration of cocaine mixed with sodium bicarbonate (baking soda), however, the VFL could not determine whether the substance was cocaine base. (Ex. 2)

On December 14, 2006,  Rutland Police Department evidence custodian Chris Kiefer-Cioffi destroyed all of the evidence in this case except for some jewelry and currency. (Ex. 3).  The destruction was part of a quarterly cleaning of the evidence room intended to increase space for new

5

evidence.  According to standard operating procedure,
Kiefer-Cioffi first goes through all of the files pertaining
to evidence stored in her custody.  She then prints out
docket sheets from Vermont Courts Online to determine
whether the case is still pending.  At times, she must ask
the United States Attorney's office about federal charges.
The evidence table attached to the Rutherford/Shine evidence
(04RL10495) only referenced Rutherford.  Although Kiefer-
Cioffi does not recall Rutherford having a co-defendant, the
records reflect that she printed out Vermont docket sheets
for both Shine and Rutherford.  Kiefer-Cioffi then contacted
the United States Attorney's office in Rutland to inquire
about the status of several individuals she believed were
being prosecuted federally, including Rutherford. (Ex. 3).
Kiefer-Cioffi learned from a secretary at the United States
Attorney's office that Rutherford has signed a plea
agreement in his federal case, which led Kiefer-Cioffi to
conclude that the evidence in his case should be preserved.
Kiefer-Cioffi has no recollection of speaking to the United
States Attorney's office about Shine, but made notes on the
back of his docket sheet indicating that he also faced
federal charges ("Fed. Indictment Serving Time").  Although

6

she does not remember learning about Shine's status, she testified that his file and associated evidence should have been preserved.  Nevertheless, Kiefer-Cioffi inadvertently placed the table for the Rutherford/Shine evidence in a pile of other evidence tables to be destroyed, completed destruction paperwork (Ex. 8), and destroyed it as a matter of course.

Kiefer-Cioffi testified that she learned of her error for the first time in speaking with someone from the United States Attorney's office.  On January 10, 2007, Assistant United States Attorney Barbara Masterson learned from Detective LaChance that Kiefer-Cioffi had destroyed some of the evidence.  Over the next three weeks Masterson and Kiefer-Cioffi exchanged messages with each other.  On January 26, 2007, Assistant United States Attorney Craig Nolan contacted the VFL and learned that only the drugs seized from the pot in the kitchen remained in its storage. On January 31, 2007, Masterson and Nolan learned that only the seized jewelry remained at the Rutland Police Department evidence facility.  That same day, Masterson and Nolan informed Shine's counsel about the destruction of the evidence.  The drugs from the kitchen pot, jewelry, and

7

photographs of the basement, photographs of the pile of
clothes, and photographs of the contents of the McDonald's
bag are all that remain.

<u>Discussion</u>

Shine's motions to dismiss and to produce or exclude
both arise from the destruction of evidence seized on
October 29, 2004.  Shine claims he was denied his
constitutional rights to due process and confrontation
because the government destroyed the seized evidence.  The
government contends that Shine is not entitled to either
dismissal or exclusion because the evidence was not
destroyed in bad faith, one of the requirements under the
<u>Youngblood-Trombetta</u> standard for imposing sanctions for
destruction of the evidence

The Second Circuit has noted that "[w]hen it occurs,
the government's loss of evidence may deprive a defendant of
the right to a fair trial."  <u>United States v. Rahman</u>, 189
F.3d 88, 139 (2d Cir. 1999).  In order for criminal
prosecutions to comport with the prevailing notions of
fundamental fairness, due process requires that the
government disclose exculpatory evidence material to guilt
or punishment to the defendant upon request.  <u>Brady v.</u>

8

Maryland, 373 U.S. 83, 87 (1963).  Loss or destruction of evidence, however, is slightly different than evidence that is suppressed in violation of Brady.  California v. Trombetta, 467 U.S. 479, 486 (1984).

> Whenever potentially exculpatory evidence is
> permanently lost, courts face the treacherous task of
> divining the import of materials whose contents are
> unknown and, very often, disputed.  Moreover,
> fashioning remedies for the illegal destruction of
> evidence can pose troubling choices . . . [such as]
> barring further prosecution or suppressing . . . the
> [government's] most probative evidence.

Id. at 486-87.  Further, "where the government suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." Illinois v. Fisher, 549 U.S. 544, 547 (2004) (explaining Brady standard).  On the other hand, the failure to preserve potentially useful evidence "does not violate due process *unless a criminal defendant can show bad faith on the part of the police*." Id. at 548 (internal citations omitted and italics in original) (distinguishing Arizona v. Youngblood, 488 U.S. 51 (1989) from Brady for a due process violation). The "potentially useful evidence" in Youngblood was distinct from material exculpatory evidence because the exculpatory value of the Youngblood evidence was not apparent before the

9

evidence was destroyed; more tests *may* have exonerated the
defendant. <u>Youngblood</u>, 488 U.S. at 57 (emphasis added).

     Accordingly, the imposition of sanctions on the
government for destroying evidence depends on the
prejudicial effect of the loss on the defendant and the
government's culpability.  <u>Rahman</u>, 189 F.3d at 139.  As a
threshold requirement to imposing sanctions for destroyed
evidence, the destruction must be "chargeable to the
[government]." <u>Rahman</u>, 189 F.3d at 139 (quoting <u>Colon v.
Kuhlmann</u>, 865 F.2d 29, 30 (2d Cir. 1988)).  Sanctions are
then appropriate when three elements are met: (1) the
evidence must have had an apparent exculpatory value before
it was destroyed, <u>Trombetta</u>, 467, U.S. at 489; (2) the
defendant must be "unable to obtain comparable evidence by
other reasonably available means," <u>id.</u>; <u>United States v.
Bakhtiar</u>, 994 F.2d 970, 976 (2d Cir. 1993) (sanctions for
lost evidence requires showing that losses prejudiced the
defense); and (3) the government must have acted in bad
faith unless the evidence was materially exculpatory.
<u>Compare</u> <u>Brady</u>, 373 U.S. at 87 <u>with</u> <u>Youngblood</u>, 488 U.S. at
57; <u>see also</u> <u>Trombetta</u>, 467, U.S. at 488 (noting no
violation where failure to preserve evidence was in good

faith and in accord with normal practice).

Here, there is no question that the destroyed evidence is chargeable to the government. The Rutland Police Department evidence custodian destroyed the evidence as a part of her quarterly cleaning routine. (Ex. 3). Shine argues that the destroyed evidence was exculpatory within the meaning of Brady, was necessary to his defense and even if it was only potentially useful, it was disposed of in bad faith. Shine contends that the destroyed evidence would establish that Rutherford, not Shine, had ownership and control over the cocaine base. For example, Shine claims he could have put on the sweat pants or examined them for paint stains (Rutherford works as a house painter) to establish they were not his. Shine also claims that the delay in informing his counsel that the evidence was destroyed amounted to *per se* bad faith on the government's part. Finally, Shine argues that the government's claim of negligence should fail because this destruction of evidence was not part of a normal procedure. He alleges that there was a clear failure to follow standard procedures both in the informal procedure for gathering evidence and the purported accidental destruction.

11

The Court finds that Shine has failed to meet the three elements required before sanctions are warranted when the government destroys evidence.  First, there is no indication that the preservation of the sweat pants or the drugs seized from the basement or anywhere else is exculpatory.  The 59 baggies were not left by their owner in the pocket of the sweat pants; but rather, the sweat pants were rolled-up around the McDonald's bag and then hidden in a pile of other garments in the basement.  Thus, the ownership of the crack cocaine is not linked to the ownership of the sweat pants.  Similarly, the documents in Rutherford's name found in the basement are indicative that he indeed lived in the apartment, but not necessarily exculpatory for Shine as to the ownership of the drugs.  Given the government's other evidence connecting Shine to the drugs, including witnesses and police surveillance, the exculpatory value of the destroyed sweat pants and drugs was not apparent to law enforcement or the government before the evidence was destroyed under the <u>Brady</u> standard.  On the contrary, the existing test results inculpate Shine as to the drugs found in the basement.  Thus, the destroyed evidence was potentially useful rather than materially exculpatory

12

because another test may or may not have proved the existing test results wrong.  Fisher, 540 U.S. at 547-48 (explaining the difference between Brady evidence and Youngblood evidence).

Shine also fails to show that he is unable to get comparable evidence for his defense.  Notwithstanding the destruction of most of the evidence, Shine has photographs of the sweat pants and McDonald's bag found in the basement. He also has raw VFL data and documentation of the destroyed drugs.  Should Rutherford testify at Shine's trial, Shine will have the opportunity to cross-examine him on any defense theory, including the fact that the drugs were found in Rutherford's basement and kitchen.

Finally, the destruction of the evidence here was a result of a mistake, which negates the requisite finding of bad faith.  Even where the destroyed evidence is a defendant's "only hope for exoneration," if the evidence is only potentially useful, the Youngblood bad-faith test applies.  Fisher, 540 U.S. at 549.  In Fisher, the defendant argued for dismissal because he was denied the opportunity to test the drugs again to show the police were mistaken. Id.  The Court concluded that "the bad-faith requirement . .

13

. depended not on the centrality of the contested evidence, but on the distinction between material exculpatory evidence and potentially useful evidence." Id. (internal quotations omitted). Here, though presented as a Sixth Amendment confrontation issue, Shine essentially seeks to bar testimony from government chemists because he did not have the opportunity to test the drugs, which *may* have called into question the results of the VFL testing on the sample of drugs found in the basement. While Shine contends the evidence is "far more than just potentially useful," (Paper 111, at 4), the fact that an additional test of the drugs may not show the VFL's results were mistaken, makes this evidence "potentially useful" and subject to the bad-faith requirement.

The delay between the December 14, 2006 destruction and January 31, 2007, when Shine's counsel learned of the destruction, does not amount to bad faith per se. Shine has asserted no evidence that the prosecution intentionally delayed informing the defense of the destruction because of plea negotiations with Rutherford and Shine. On the contrary, the government did not confirm that the evidence had been destroyed until January 31.

14

Even assuming the government may be charged with delay, the actual destruction of the evidence was a mistake, which was at most negligent.  Kiefer-Cioffi's negligence does not constitute bad faith in this matter because, contrary to Shine's allegation, she destroyed the evidence as a part of a normal, reliable procedure, albeit imperfect in this circumstance.  See Bakhtiar, 994 F.2d at 976 (noting sanctions for negligent loss of evidence only appropriate where government did not have reliable system for preserving evidence); see also Fisher, 540 U.S. at 548 (undisputed that evidence destroyed in good faith and according to normal practice).  Notwithstanding the inconsistencies between the statement of facts in the government's response papers and the testimony from Officer Kiefer-Cioffi, Shine has not shown that Kiefer-Cioffi's inadvertent placement of the Rutherford/Shine evidence table into the destruction pile rather than back into the file to be preserved was anything more than a mistake.  Kiefer-Cioffi testified that she immediately regretted the mistake when she learned of her error.  No sanctions are warranted here and therefore the Court recommends the motion to dismiss be denied.

Shine also alleges a Sixth Amendment violation stemming

from the destroyed evidence.  "The Confrontation Clause
provides two types of protections for a criminal defendant:
the right physically to face those who testify against him,
and the right to conduct cross-examination." <u>Pennsylvania v.</u>
<u>Ritchie</u>, 480 U.S. 39, 50 (1987).  Shine alleges a violation
of the latter right, claiming he cannot meaningfully cross-
examine Rutherford and the government's chemists.  As to
Rutherford, Shine claims that the government's improper
conduct preserved Rutherford's apparent credibility by
destroying the very evidence that would have it called into
question.  Thus, Shine argues, the government should be
barred from calling Rutherford as a witness.  As to the
government chemists, Shine argues that their testimony
should be excluded because he never had the opportunity to
examine and develop expert testimony with which to confront
them.

    "[T]he Confrontation Clause only guarantees 'an
*opportunity* for effective cross-examination, not cross-
examination that is effective in whatever way, and to
whatever extent, the defense might wish.'" <u>Id.</u> at 53
(emphasis and quotations in original).  Although it is true
that Shine may not confront Rutherford with the sweat pants

and other destroyed evidence, he will still have a full
opportunity to cross-examine Rutherford should he testify at
trial.  Shine can cross-examine Rutherford about the
destroyed evidence using the photographs and reports.
Similarly, Shine may cross-examine Rutherford about his plea
agreement and potential bias to undermine his credibility
without having to resort to using the destroyed evidence.

As to cross-examining the chemists, Shine argues that
given a finding that the material found in the kitchen was
not crack cocaine, and the lack of testing done on 48 of the
59 baggies, the presumption from the first VFL report
identifying 11 of the 59 baggies as crack cocaine should not
be regarded as reliable.  This argument should be rejected
for several reasons.  First, the fact that the material
found in the kitchen was not crack cocaine has no impact on
whether the material found in baggies in the basement was
cocaine base as the tests revealed.  The context in which
the material from the kitchen was found – in a pot -
suggests that it was being prepared, while the material
found in the basement was individually wrapped in 59
baggies.  Second, the proper vehicle for challenging the
reliability of VFL testing is a Daubert motion supported by

17

expert testimony, not exclusion.  <u>See generally</u>, <u>Ruggiero v.</u>
<u>Warner-Lambert Co.</u>, 424 F.3d 249, 253 (2d Cir. 2005)
(explaining standard for admitting expert testimony,
including factors the Supreme Court set forth in <u>Daubert v.</u>
<u>Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1991));
<u>United States v. Yousef</u>, 372 F.3d 56, 148 (2d Cir. 2003)
(noting <u>Daubert</u> factors apply to both defense and government
experts in federal criminal proceeding).  Third, Shine has
available to him the raw data and documentation from VFL
that would permit a defense expert to review the conclusions
and scientific reliability of the VFL testing methodology.
Under the circumstances, the destruction of evidence will
not deprive Shine of his Sixth Amendment right of
confrontation.

Conclusion

For the reasons set forth above, I recommend that
Shine's motions be denied.

Dated at Burlington, in the District of Vermont, this
27th day of June, 2007.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge

18

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  Failure to file objections within the specified time waives the right to appeal the District Court's order. See Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).

_____

_____